**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

ANDY GARCIA, on behalf of himself and all others similarly situated,

*Plaintiff*,

v.

THE WENDY'S COMPANY and NCR VOYIX CORPORATION,

*Defendants*.

Case No. ________________

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff ANDY GARCIA ("Plaintiff"), on behalf of himself and all others similarly situated, allege the following Class Action Complaint (the "Action") against the above-captioned Defendants, THE WENDY'S COMPANY ("Wendy's") and NCR VOYIX CORPORATION ("NCR") (collectively, the "Defendants") upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of his counsel for violations of the federal antitrust laws, as follows:

## INTRODUCTION

1. Wendy's is a staple of the American fast-food industry, restaurants which are otherwise known as quick-service restaurants ("QSR"). For decades, Americans have relied on Wendy's affordable prices in order to feed themselves and their families; this is an Action about the abuse of that reliance and the use of it to extract supracompetitive profits from Wendy's customer base.

2. Plaintiff Garcia brings this Action against Defendants Wendy's and NCR to seek redress under the federal antitrust laws on behalf of herself and a class of all persons in the United States (the "geographic market") who have purchased food from Wendy's from January 1, 2022 through the present day (the "Class Period").

3. According to the American Family Survey in 2026, the price of food in the United States has caused nearly 1 in 5 adults – about 17% -- to go hungry.[1] QSRs, like Wendy's, have traditionally helped to fill the void between those who can afford food and those who cannot. While food insecurity festers across the country, more affordable options like QSRs historically

---

[1] Morgan Taylor, "*Nearly 1 in 5 US adults went hungry, and 1 in 4 couldn't pay a key bill in fill, survey finds,*" TC: THE COOL DOWN (ONLINE) (Nov. 22, 2026), at https://www.yahoo.com/news/us/articles/nearly-1-5-us-adults-202300881.html.

give more Americans the ability to put food on the table; indeed, studies have shown that "food insecurity has been shown to be associated with fast-food consumption."[2]

4. Thus, when QSRs increase prices – and, even worse, impose supracompetitve prices on their consumers, like Plaintiff and Class members – the implications to food security are severe and the actual consequences for those who cannot afford other food are dire. This, unfortunately, is the subject of this Action: the organized pricing scheme that pools confidential data from independently owned Wendy's franchisees to use the information in order to dictate what prices consumers pay.

5. This scheme is directed by Wendy's, which issues directives down to its franchisees, which are supposed to be independently operated and, therefore, competing with each other for business. *First*, every Wendy's franchisee must send Wendy's its confidential, granular, transaction-level point-of-sale ("POS") data pursuant to Wendy's Franchise Disclosure Document and publicly available sources which allows Wendy's "to independently and directly access certain financial and operational information and data regarding your [r]estaurant" stating that "[Wendy's] may use this information for analysis, consumer research, and any other purpose."[3] Wendy's uses a common POS system called Aloha POS, which is created, marketed, and otherwise controlled by NCR.[4]

---

[2] Lee Smith, et al., "*Food insecurity (hunger) and fast-food consumption among 180,164 adolescents aged 12-15 years from sixty-eight countries*," NATIONAL LIBRARY OF MEDICINE (ONLINE) (Feb. 14, 2022), at https://pubmed.ncbi.nlm.nih.gov/33814017/.

[3] Wendy's Franchise Disclosure Document (2025) ("FDD"), at Exhibit T, https://www.franchimp.com/pdfjs/viewer.php?f=107514_2025.pdf; FDD at Pg. 37.

[4] FDD, at 38 ("… all Wendy's Restaurants must have installed Aloha POS software supplied by NCR.").

6. According to NCR, the Aloha POS system "empowers [Wendy's] franchisees and corporate users to understand and leverage sales, cash management and transaction data to make informed decisions and quickly maximize operational efficiency."[5] Wendy's chief information officer, Kevin Vasconi, stated about Aloha POS that it "is highly impactful for our restaurants. We now have streaming real-time transaction data that goes down to the product level and gives us the ability to make on-the-spot decisions" while NCR's president and general manager stated "[o]ur next generation of Aloha uses the NCR Commerce Platform to provide a single source of reliable, timely information. Wendy's can easily connect to millions of pieces of data […] this gives operators the confidence to pivot operations and drive continuous improvements[.]"[6]

7. NCR touts Aloha POS as a product which uses "real-time data and insights to make better decisions and roll out improvements across locations with less risk."[7] Aloha POS empowers QSRs – like Wendy's – to "[u]pdate menus and pricing quickly across locations with centralized menu and pricing management."[8] The ability to share data with a common decisionmaker as well as update pricing quickly is not the sort of conduct that thousands of Wendy's franchisees should be engaging in when tasked to compete in a highly competitive QSR industry, including with each other.

8. *Second*, Wendy's uses all of this confidential information to control pricing between its franchisees – who should be competing independently. For example, after Wendy's 2023 Q4 earnings call on February 15, 2024, Wendy's announced that it would be "leveraging

---

[5] https://www.businesswire.com/news/home/20220816005018/en/NCR-Aloha-Delivers-Smarter-Data-Management-to-Wendys, (last accessed Nov. 22, 2026).

[6] *Id.*

[7] https://www.ncrvoyix.com/industry/restaurants, (last accessed Nov. 22, 2026).

[8] https://www.ncrvoyix.com/industry/restaurants/quick-service, (last accessed Nov. 22, 2026).

technology to support margin expansion" through, in part, rolling out dynamic pricing through its restaurants.[9]




9. As Wendy's spokespersons stated, "[b]eginning as early as 2025, we will begin testing a variety of enhanced features on these digital menubars like dynamic pricing, different offerings in certain parts of the day, AI-enabled menu changes and suggestive selling based on factors such as weather. **Dynamic pricing can allow Wendy's to be competitive and flexible with pricing, motivate customers to visit and provide them with the food they love at a great value. We will test a number of features that we think will provide an enhanced customer and crew experience**."[10]

---

[9] https://s1.q4cdn.com/202642389/files/doc_financials/2023/q4/2023-Q4-Earnings-Presentation.pdf, (last accesed Nov. 22, 2026), at 15.

[10] Benj Edwards, "*Wendy's clarifies plans for dynamic pricing experiment after backlash,*" ARSTECHNICA (ONLINE) (Feb. 28, 2024), at https://arstechnica.com/information-technology/2024/02/wendys-plans-ai-powered-menu-to-change-food-prices-based-on-demand-weather/ (emphasis added).

10. This, notably, was met with extreme consternation from consumers.

11. Within days, Wendy's stated that the dynamic pricing system, set to be released in 2025, "would not raise prices when our customers are visiting us the most."[11] Wendy's attempted to appease consumers, stating that Wendy's would only engage in price changes as discounts during "slower times of day."[12] This, however, is tantamount to an admission to fix prices across franchise locations; even worse, it is akin to admitting that Wendy's franchisees are not competing with each other – rather, they are at the control of a common decisionmaker, Wendy's.

12. Throughout the Class Period, prices at Wendy's continued to rise – so much so that Wendy's had to cut prices across their locations at one point in 2026.[13] This is not only evidence of higher pricing hurting consumers but is markedly counterfactual to the notion that Wendy's franchisees compete on pricing – because they are not. According to interim Wendy's chief executive officer Ken Cook, "[o]n our last earnings call, I outlined three key initiatives: knowing our customers better, simplifying our programming and execution, and **working more closely with our franchisees as One Wendy's**."[14] In reality, Wendy's franchisees should be competing with each other for customers, not working more closely as 'One Wendy's.'

13. Wendy's, therefore, has created a horizontal, hub-and-spoke price-fixing conspiracy among competing Wendy's restaurants. Wendy's serves as the hub collecting and pooling competitively sensitive information, generating coordinating pricing recommendations,

---

[11] *Id.*

[12] *Id.*

[13] Daniel Kline, "*Wendy's cuts prices and closes stores as sales slow*," THESTREET (ONLINE) (Updated Jan. 30, 2026), at https://www.thestreet.com/restaurants/wendys-tackles-sales-slump-with-price-cuts-and-store-closures.

[14] *Id* (emphasis added).

and, through its company-owned restaurants, a direct competitor of the franchisees. The franchisees are the spokes, supposing competing restaurants whose independent pricing decisions are displaced by Aloha POS and Wendy's corporate decision making. This is unlawful *per se* under Section 1 of the Sherman Act.

14. Throughout the Class Period (and continuing through the present day), Defendant's prices for food items at Wendy's QSR restaurants in the United States are artificially higher than they otherwise would have but for the Defendant's illegal conduct.

15. As such, Plaintiff Garcia, on behalf of himself and all other similarly situated, alleges that Defendants' conduct is unlawful under Sections 1 of the Sherman Act. Through this Action, Plaintiff Garcia brings this action to recover his actual damages and trebled damages; disgorgement of profit into a constructive trust; injunctive relief through an order of this Court to cease Defendant's unlawful conduct; reasonable costs and attorneys' fees; pre- and post-judgment interest; and any other relief that this Court deems just and proper for Plaintiff Garcia as well as on behalf of all others similarly situated.

## JURISDICTION AND VENUE

16. ***Subject Matter and Supplemental Jurisdiction***. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

17. ***Personal Jurisdiction***. This Court has personal jurisdiction over Defendant under Section 12 of the Clayton Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1)(A). Additionally, this Court has personal jurisdiction over Defendant NCR because it is incorporated

in Maryland, both Defendants conducts a substantial amount of business in Maryland, and Defendants are registered to do business in the state of Maryland.

18. ***Venue***. Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendant maintains their principal place of business, business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## PARTIES

### PLAINTIFF

***Plaintiff Andy Garcia***

19. Plaintiff Andy Garcia is a resident of the state of California.

20. Plaintiff Andy Garcia has been a regular Wendy's customer for decades, dining there with his family and eating there at least once a week. During the Class Period, Plaintiff Garcia regularly purchased Wendy's menu items at various restaurants including in California.

21. As a result of Defendants' anticompetitive conduct, Plaintiff Garcia paid supracompetitive prices for these purchases.

### DEFENDANTS

***Defendant The Wendy's Company***

22. Defendant The Wendy's Company is a publicly traded Delaware corporation headquartered in Dublin, Ohio.

23. Founded in 1969 in Columbus, Ohio, Wendy's is "primarily engaged in the business of operating, developing, and franchising a system of quick-service restaurants serving

high-quality food."[15] As of December 28, 2025, "there were 5,969 Wendy's restaurants in operation in the U.S. Of these restaurants, 423 were operated by [Wendy's] and 5,546 were operated by a total of 203 franchisees."[16]

24. In 2025, Wendy's announced *Project Fresh*, which is a comprehensive business plan to drive profitable growth based upon four strategic pillars: (1) brand revitalization, (2) operational excellence, (3) system optimization, and (4) capital allocation. The goal of *Project Fresh* is to "drive profitable average unit volume growth and increase traffic in the U.S. by improving marketing effectiveness, menu offerings, and the customer experience, and to enhance franchisee economics."[17]

25. Wendy's global systemwide sales in 2025 were $13.96 billion with an increase of 157 net new restaurants in 2025.[18]

***Defendant NCR Corporation***

26. Defendant NCR Voyix Corporation is a publicly traded Maryland corporation headquartered in Atlanta, Georgia.

27. NCR is a "global platform-powered leader in unified commerce for shopping and dining, empowering customers to simplify transactions, optimize and scale operations and deliver

---

[15] WENDY'S 2025 SEC FORM 10-K, at https://s1.q4cdn.com/202642389/files/doc_financials/2025/q4/TWC-10K-2025-AS-FILED-with-Exhibits.pdf, at 6.

[16] *Id.*

[17] *Id.*

[18] *Id.*, at 36.

superior experiences to customers through [a] modernized suite of microservices-based applications and comprehensive service offerings."[19]

28. NCR's restaurants segment "is focused on serving restaurants and food service establishments, including quick-service […] solutions include, among others, POS hardware and software solutions, payment processing and merchant acquiring services, installation, maintenance, and managed and professional services. These solutions are designed to help streamline order and transaction processing, increase consumer engagement, increase kitchen productivity, and reduce operating costs."[20]

29. One of NCR's POS products is called Aloha Next by Voyix (referred to herein as "Aloha POS").[21] According to NCR, Aloha POS is a "cloud-based or hybrid-cloud POS solution[] that enable[s] front- and back-of-house capabilities for retailers and restaurants. Within these POS offerings, we offer microservices and a modular architecture, which allows customers to tailor their POS environment to meet their unique needs. These POS offerings are natively integrated with the Voyix Commerce Platform [to] drive operational efficiencies, increase profitability and manage labor and inventory."[22]

---

[19] NCR'S 2025 SEC FORM 10-K, at https://investor.ncrvoyix.com/static-files/ddb308de-dfb0-4534-b228-b651dd2233d0, at 1.

[20] *Id.*, at 77.

[21] *Id.*, at 3.

[22] *Id.*

## FACTUAL ALLEGATIONS

### ***The Relevant Market***

30. ***Relevant Product and Geographic Market***. Defendant's product market is the sale of meals and menu items to consumers by QSR hamburger restaurants (the "QSR Hamburger Market"). These restaurants compete directly for consumers who seek convenience, relatively inexpensive, quickly prepared and standardized hamburger meals. These restaurants differ from full-service, fast-casual, and other categories of QSRs, including the purchase of groceries.

31. The relevant geographic market is the United States, because Wendy's generates pricing recommendations centrally from its headquarters to locations across the country.

32. Defendants engaged in a horizontal price-fixing conspiracy among competing Wendy's restaurants, facilitated and enforced through the use of their POS system and pricing controls by Wendy's headquarters. Such conduct constitutes a *per se* violation of Section 1 of the Sherman Act. Plaintiff, therefore, need not establish a relevant market or market power to prevail on *per se* claims. However, Plaintiff alleges the following relevant market above and description of market power below.

33. Wendy's possessed substantial pricing power as shown directly by their ability to control prices and through the persistence of large price gaps between nearby Wendy's QSR restaurants.

## ***Wendy's Restaurants and the Price Fixing Scheme***

### ***Wendy's Restaurants are Independent Competitors by Design***

34. Wendy's profits when its franchisees raise menu prices. It collects royalties of approximately 4% of gross sales according to Wendy's Franchise Disclosure Document, while retaining revenue from its company owned and operated Wendy's restaurants.[23] Wendy's, therefore, has a direct financial incentive to increase menu prices, provided that higher prices do no reduce sales sufficiently to offset the increases.

35. Wendy's franchisees are separately owned businesses, legally independent of each other Wendy's franchisee and from Wendy's company owned and operated Wendy's restaurants. In fact, according to the FDD, franchisees compete directly as well as with company owned locations.[24] Absent the scheme discussed herein, the franchisee owned restaurants (which make up over 95% of all Wendy's restaurants) would make their own pricing decisions and compete with each other for customers, including and especially with respect to price.

36. Indeed, the franchisees, Wendy's company owned locations, and Wendy's corporate all engage in a price fixing conspiracy facilitated by NCR's Aloha POS system – as described below. The FDD binds each restaurant into the use of this system, and each franchisee pays 4% of its gross profits to Wendy's in exchange for being part of the franchise system. This agreement is a system-wide arrangement which coordinates behavior between the Wendy's parties and the individual franchise owners.

---

[23] FDD, at 58.

[24] FDD, at ii, iii, 43 ("[Defendant] may establish other franchised or company-owned Wendy's Restaurants and other outlets that compete with your location").

37. Absent the conspiracy, each independently owned franchisee and each company owned restaurant would independently set their own menu prices based on their own specific costs, customer demand, and competition from nearby restaurants, including other Wendy's locations.

38. Historically, Wendy's menu prices generally tracked increases in operating costs and inflation. Additionally, Wendy's pricing was established independently by franchisees and was even highlighted as a risk factor for Wendy's business given that franchisees were competing for business.

39. As Wendy's 2019 SEC Form 10-k states: "[a]s of December 29, 2019, approximately 95% of restaurants in the Wendy's system were operated by franchisees. Wendy's franchisees are contractually obligated to operate their restaurants with the standards set forth in our franchise and other agreements with them […] However, franchisees are independent third parties that we do not control, and franchisees own, operate, and oversee the daily operations of their restaurants […] franchisees have discretion as to the prices charged to customers. As a result, the ultimate access and quality of any franchise restaurant rests with the franchisee. If franchisees do not successfully operate their restaurants in a manner consistent with required standards, then royalty payments to us could be adversely affected and the brand's image and reputation could be harmed, both of which in turn could hurt our business and operating results."[25]

40. The Wendy's 2026 SEC Form 10-k has the same statement regarding the choice of franchisees to use their discretion with respect to pricing.[26]

---

[25] WENDY'S 2019 SEC FORM 10-K, at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000030697/40e58ca0-b473-433d-99b7-561ba60c88bb.pdf, at 16.

[26] WENDY'S 2026 SEC FORM 10-K, at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000030697/f815e8c6-8033-4e7b-90d8-49e5bf08b4a8.pdf, at 19.

41. However, this is an attempt by Wendy's to conceal the truth from the public: that Wendy's locations which are independently owned by franchisees do not compete with each other, but collusively delegate their pricing decisions to a common decisionmaker: Wendy's corporate.

***Wendy's Requires Competing Restaurants to Share Confidential Information***

42. Wendy's requires its franchisees to provide it with confidential, transaction level POS data, including detailed information regarding pricing and sales practices. As the Wendy's FDD explains, "sales volumes for Franchised Restaurants are based on […] automated data generated by the restaurant point of sale system."[27] The FDD's Exhibit T includes "Wendy's Technology Products and Services Agreement," with a schedule of the products and services that are provided by Wendy's and required to be used by the FDD.[28] One such technology requirement is the "Looker Reporting" system, which "provides system access and ongoing support for Franchisee Operational reporting and analytical data" including access to "Wendy's Model of Excellence Sales Data Dashboard."[29]

43. According to Wendy's, the Model of Excellence is an operational improvement system.[30] Essentially, the Model of Excellence dashboard mentioned by the FDD is a means of collating and organizing competitively sensitive information so that franchisees can "ask the right questions, diagnose issues, inform targeted solutions, and understand how they stack up against

---

[27] FDD, at 54.

[28] FDD, at Exhibit T.

[29] FDD, at Exhibit T, at 18.

[30] Ben Coley, "*Wendy's Unveils New Operational Vision to Boost Margins and Customer Loyalty*," QSR MAGAZINE (ONLINE) (March 6, 2025), at https://www.qsrmagazine.com/operations/wendys-unveils-new-operational-vision-to-boost-margins-and-customer-loyalty/.

other restaurants."[31] The way that this business intelligence platform works is "to provide one source for performance analytics, reporting, and insights to [franchise] operators."[32]

44. Under the new system, which is targeted specifically at profits and losses, each franchise operator has one dedicated corporate Wendy's employee "to steer performance, create action plans, focus on operations performance, engage in brand initiatives, and improve profitability."[33] This, to be clear, is an enforcement mechanism which saps independent franchisees of their ability to govern their restaurants as they see fit.

45. Through this program, Wendy's ultimate goal is to improve profitability in part through benchmarking statistics which can be done through the analysis of competitively sensitive information.[34] The benchmarking platform will provide automated monthly reports and balance sheets for franchisees, "enabling franchisees to better understand their financial performance relative to benchmarks[.]"[35]

46. All of this is made possible through the Aloha POS system.

47. Wendy's has been using the Aloha POS system as early as 2016.[36] NCR supplies the Aloha POS system to Wendy's and, thus, to each individual Wendy's location pursuant to the FDD; as the FDD states, "Franchisee warrants, represents, and agrees […] [to] fulfill[] all other

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] Brian Krebs, "*Wendy's: Breach Affected 5% of Restaurants*," KREBSONSECURITY (ONLINE) (May 11, 2016), at https://krebsonsecurity.com/2016/05/wendys-breach-affected-5-of-restaurants/.

conditions required by the Franchisor in connection with this renewal, including, without limitation, compliance with technology software/hardware equipment purchase/installation requirements, which includes installation of Wendy's required electronic point of sale system operating with Aloha Software supplied by NCR Corporation."[37] POS information, including sales information, is shared then from the Wendy's location to Wendy's Aloha Server.[38]

48. As the FDD states, "Wendy's will provide the require setup and configure the Aloha POS […] configurations for a restaurant."[39] This includes basic menu maintenance, including "price configuration."[40] Aloha POS's QSR system is marketed as capable of increasing throughput across every order point with "unified workflows [that] support drive-thru, front counter, kiosks, mobile and QR ordering and payments with unified workflows," "dynamic marketing [which] promote[s] your best sellers and limited-time offers with dynamic loyalty programs and marketing communications," and "update[d] menus and pricing quickly across locations with centralized menu and pricing management."[41]

---

[37] FDD, at Exhibit G, at 2.

[38] FDD, at Exhibit T, at 10.

[39] FDD, at Exhibit T, at 14.

[40] *Id.*

[41] https://www.ncrvoyix.com/industry/restaurants/quick-service, (last accessed Nov. 23, 2026).

49. In August of 2022, Wendy's expanded the use of Aloha POS to include enhanced visibility into its store, sales and product data.[42] Aloha POS allows its users to "[s]et pricing and availability by channel, location, or time of day to protect margins and respond to demand."[43]

50. According to a joint press release, Aloha POS system "empowers [Wendy's] franchisees and corporate users to understand and leverage sales, cash management and transaction data to make informed decisions and quickly maximize operational efficiency."[44] Wendy's chief information officer, Kevin Vasconi, stated about Aloha POS that it "is highly impactful for our restaurants. We now have streaming real-time transaction data that goes down to the product level and gives us the ability to make on-the-spot decisions" while NCR's president and general manager stated "[o]ur next generation of Aloha uses the NCR Commerce Platform to provide a single source of reliable, timely information. Wendy's can easily connect to millions of pieces of data […] this gives operators the confidence to pivot operations and drive continuous improvements[.]"[45]

51. Wendy's use of centralized pricing through their corporate headquarters is not a hypothetical or merely something that Wendy's has the capacity of doing but is choosing not to. As previously stated, in 2024, Wendy's announced it would implement dynamic pricing across its storefronts; further, in 2026, Wendy's announced there would be universal price cuts across its

---

[42] https://www.businesswire.com/news/home/20220816005018/en/NCR-Aloha-Delivers-Smarter-Data-Management-to-Wendys, (last accessed Nov. 23, 2026).

[43] https://www.ncrvoyix.com/platform/restaurant-applications/ordering-fulfillment/point-of-sale, (last accessed Nov. 23, 2026).

[44] https://www.businesswire.com/news/home/20220816005018/en/NCR-Aloha-Delivers-Smarter-Data-Management-to-Wendys, (last accessed Nov. 22, 2026).

[45] *Id.*

storefronts. Both of these suggest and are indicative that Wendy's is the common decisionmaker when it comes to restaurant pricing, not the independent franchisees.

52. Courts around the country have sustained Sherman Act claims where competitors priced their products through a common intermediary that pooled their data. *See, e.g. In re RealPage, Inc. Rental Software Litigation (No. II)*, 709 F. Supp. 3d 478 (M.D. Tn. 2023) (pricing dictated by a common intermediary where rental apartment data was pooled amongst horizontal competitors); *In re MultiPlan Health Insurance Provider Litigation*, 789 F. Supp.4th 1069 (N.D. Ill. 2025) (same but with respect to the suppression of insurance reimbursement rates for healthcare providers) (collecting cases).

***Prices Have Risen Under the Wendy's Pricing System***

53. Wendy's increases in price come at a point where Wendy's has faced significant headwinds due to beef prices and intra-brand competition in the Relevant Market.[46] In October of 2026, Wendy's was facing a potential shareholder takeover.[47] In a letter to the company's board of directors, Nelson Peltz, who was attempting to invest in Wendy's stated: "Wendy's sits at a critical juncture. The external environment has become increasingly challenging given the significant pressures on the U.S. consumer, economic uncertainty, persistent commodity inflation and intensifying competition, particularly within the QSR burger category."[48]

54. This is all the incentive in the world for Wendy's to continue to engage in the scheme as alleged in this Action.

---

[46] "*Wendy's, struggling with beef prices and growing competition, gets a buyout offer*," THE ASSOCIATED PRESS (ONLINE) (Oct. 29, 2026), at https://www.nbcnews.com/business/business-news/wendys-struggling-beef-prices-competition-gets-peltz-buyout-offer-rcna606281.

[47] *Id.*

[48] *Id.*

55. Indeed, prices have risen during the scheme that the pricing system has been implemented. In the past decade alone, fast-food prices at QSR hamburger restaurants have risen between 39% and 100%, outpacing increases in general inflation and grocery costs.[49] Consumers have complained that Wendy's is no different.[50] Instead of going to Wendy's, consumers have gone to other QSR hamburger restaurants which are more fairly priced – which shows the willingness of consumers to seek more affordable prices when shopping in the Relevant Market.[51]

56. In a competitive franchisee system, there would be price competition between Wendy's franchisees which would drive prices down. Instead, consumers are stuck paying higher prices at Wendy's because of the scheme as alleged herein.

***Antitrust Injury***

57. There have been significant injuries to consumers and in the Relevant Market, generally.

58. The anticompetitive effects of common pricing tools are well known. Economic research demonstrates that common pricing tools, such as algorithms, can increase prices even when they recommend different prices to different sellers. At the Wharton School of the University of Pennsylvania, economist Joseph E. Harrington, Jr. modeled competing firms that buy their algorithm from the same third-party developer; Harrington found that outsourcing pricing

---

[49] Mariam Qayum, "*Customer Calls Out Wendy's Pricing After Being Charged Almost $10 for a Drink and Fries: 'See You Never,'*" YAHOO! LIFE (ONLINE) (Nov. 12, 2026), at https://www.yahoo.com/lifestyle/articles/customer-calls-wendys-pricing-being-043155058.html.

[50] *Id.*

[51] *Id.*

decisions to a common decisionmaker, like an algorithm, can make prices more responsive to differences in local demand while increasing industry profits and harming consumer welfare.[52]

59. This research is consistent with the scheme as alleged herein.

60. Wendy's collects competitively sensitive information from competing restaurants using Aloha POS, uses a centralized pricing criteria, and monitors franchisees' adherence to those recommendations. This arrangement reduces independent price competition and enables Wendy's and its franchises to maintain prices at supra-competitive levels.

61. Defendants' conspiracy eliminated independent price competition amongst Wendy's restaurants, the very system that Wendy's designed itself. The conspiracy raised prices to supracompetitive levels by eliminating price competition during the Class Period.

## CLASS ALLEGATIONS

62. Plaintiff Garcia brings this action on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> **Nationwide Class.** All persons in the United States who purchased one or more menu items from a Wendy's restaurant in the United States, whether operated by a Wendy's franchisee or by Wendy's itself, from the beginning of the Class Period and until the effects of the Defendants' anticompetitive conduct ceases.

63. The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

64. Plaintiff's claims are typical of those of the Class.

---

[52] *See* Joseph E. Harrington, Jr., *The Effect of Outsourcing Pricing Algorithms on Market Competition*, 68 MGMT.SCI. 6355 (2022).

65. Plaintiff and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more in the Relevant Market than they otherwise would have in a competitive market.

66. Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are not antagonistic to the Class.

67. Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members, since the Defendants have acted and refused to act on grounds generally applicable to the Class.

68. Questions of law and fact common to the Class include:

a. Whether Defendants and the franchisees have agreed to fix, raise, maintain, or stabilize menu pricing during the Class Period through the scheme as alleged herein;

b. Whether Defendant Wendys coerced franchises to adopt its prices;

c. Whether Defendants exchanged competitively sensitive information through the Aloha POS system and/or through Wendy's Model of Excellence digital dashboard;

d. Whether the conduct is unlawful *per se* or through a Rule of Reason analysis;

e. Whether the conduct raised prices to supracompetitive levels;

f. The class-wide measure of damages; and,

g. Whether Plaintiff and Class members are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

69. Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

70. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## FIRST CAUSE OF ACTION

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

PRICE FIXING

15 U.S.C. § 1

(ON BEHALF OF THE CLASS FOR DAMAGES, INJUNCTIVE AND EQUITABLE RELIEF)

71. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

72. The Relevant Market in the United States is a relevant antitrust market.

73. Beginning no earlier than 2016 and no later than 2022, and continuing through the present day, Defendants and their co-conspirator franchisees entered into a continuing contract, combination, or conspiracy to fix, raise, maintain, and stabilize the prices of menu items sold at Wendy's restaurants in the United States.

74. Wendy's collects competitively sensitive information from competing restaurants using Aloha POS, uses a centralized pricing criteria, and monitors franchisees' adherence to those

recommendations. This arrangement reduces independent price competition and enables Wendy's and its franchises to maintain prices at supra-competitive levels.

75. This was done through an agreement to delegate pricing to a common decisionmaker, Wendy's, through the supply of nonpublic data with Defendant NCR through their Aloha POS system.

76. This conspiracy is a horizontal agreement among competitors to fix prices and is unlawful *per se*. In the alternative, it is unlawful under a quick-look analysis because its anticompetitive effects on prices are obvious; or, alternatively, under the Rule of Reason because it had substantial anticompetitive effects which have no procompetitive justifications that could be achieved through substantially less restrictive means, such as through pricing tools which do not pool competitors data, do not condition one restaurant's price on its competitors' prices, and are not tied to any other confidential information.

77. Plaintiff and Class members were harmed through the supracompetitive prices imposed on them as a result of the scheme and are entitled to actual damages, treble damages, costs, reasonable attorneys' fees, and an injunction for the continuing violation.

## SECOND CAUSE OF ACTION

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
UNLAWFUL INFORMATION EXCHANGE

15 U.S.C. § 1

(ON BEHALF OF THE CLASS FOR DAMAGES, INJUNCTIVE AND EQUITABLE RELIEF)

78. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

79. Beginning no earlier than 2016 and no later than 2022, and continuing through the present day, Defendants and their co-conspirator franchisees entered into a continuing contract, combination, or conspiracy to fix, raise, maintain, and stabilize the prices of menu items sold at Wendy's restaurants in the United States.

80. This was done through the sharing of current, granular, nonpublic, competitively sensitive information, including transaction-level sales, prices, and product information. This exchange was and is continuous and centralized, as it took and takes place among competitors in a market of standardized products and inelastic demand, and was enforced through monitoring and renewal decisions.

81. This was done through an agreement to delegate pricing to a common decisionmaker, Wendy's, through the supply of nonpublic data with Defendant NCR through their Aloha POS system.

82. This conspiracy is a horizontal agreement among competitors to fix prices and is unlawful *per se*. In the alternative, it is unlawful under a quick-look analysis because its anticompetitive effects on prices are obvious; or, alternatively, under the Rule of Reason because it had substantial anticompetitive effects which have no procompetitive justifications that could be achieved through substantially less restrictive means, such as through pricing tools which do not pool competitors data, do not condition one restaurant's price on its competitors' prices, and are not tied to any other confidential information.

83. Plaintiff and Class members were harmed through the supracompetitive prices imposed on them as a result of the scheme and are entitled to actual damages, treble damages, costs, reasonable attorneys' fees, and an injunction for the continuing violation.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of himself and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

A. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representatives and her counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The price fixing and unlawful information exchange as alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

C. Plaintiff and the Class recover damages and non-restitutionary disgorgement of financial profits to the maximum extent allowed under the applicable laws in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent such antitrust laws permit;

D. Plaintiff and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E. Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law and Plaintiff and the members of the Class have such other and further relief, including injunctive relief, as the case may require and the Court may deem just and proper.

**JURY TRIAL DEMAND**

84. Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**DATED**: November 23, 2026

Respectfully submitted,

*/s/ Blake Hunter Yagman*
Blake Hunter Yagman
*blake.yagman@yagmanpllc.com*
**YAGMAN PLLC**
THE CHRYSLER BUILDING
405 Lexington Avenue, 26th Floor
New York, New York 10174
Tel.: (929) 709-1493

*Attorneys for Plaintiff Garcia and Proposed Class*